**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHASITY CONGIOUS, by and through her Guardian, Kimberly Hammond, on behalf of Herself and as Mother and Next Friend of Z.C.H., Deceased. | ) ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:22-cv-00027 |
| | ) |
| CITY OF FORT WORTH, OFFICER DAVID NGUYEN, #4303, L. MARTINEZ, N. CERVANTES, SHERIFF BILL WAYBOURN, and TARRANT COUNTY, | ) ) ) ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

NOW COMES the Plaintiff, CHASITY CONGIOUS, by and through her Guardian, Kimberly Hammond, on behalf of herself and as Mother and Next Friend of Z.C.H., deceased, by and through her counsel, SAMUELS & ASSOCIATES, LTD., THE LAW OFFICE OF JARRETT ADAMS, PLLC, and ELBIALLY LAW, PLLC, complaining of the defendants, CITY OF FORT WORTH, OFFICER DAVID NGUYEN, #4303, L. MARTINEZ, N. CERVANTES, SHERRIFF BILL WAYBOURN, and TARRANT COUNTY, states as follows:

### INTRODUCTION

1.     On January 15, 2020, 21-year-old CHASITY CONGIOUS, who suffers from developmental disabilities, has moderate-mental retardation, and was diagnosed with bipolar disorder and schizophrenia, was having a mental health crisis when her family

called the police to have her involuntarily committed at JPS Hospital; instead, she was arrested and remanded to Tarrant County Jail.

2.      During her five months at Tarrant County Jail, Chasity did not have a single court date and her condition deteriorated to the point that when she gave birth alone in her cell at the Tarrant County Jail to baby Z.C.H. she was almost entirely nonverbal.

3.      According to Defendant Bill Wayborn, Chasity was "severely mentally," "incommunicative," and "hadn't made a sound in weeks" at the time she gave birth, which he confirmed by personally visiting with her.

4.      Z.C.H. suffered severe oxygen loss postpartum and for a week was kept alive solely through intensive support before it was removed on May 27, 2020.

5.      This action is brought pursuant to the laws of the State of Texas and the Constitution of the United States of America against the defendants for their willful and wanton actions causing the tragic and unnecessary death of Z.C.H., and irreparable trauma to her mother, Chasity.

## JURISDICTION

6.      This action is brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

7.      The jurisdiction of this Court is invoked pursuant to the judicial code 28 U.S.C. § 1331 and 1343 (a); the Constitution of the United States.

8.      Pendent jurisdiction as provided under 28 U.S.C. § 1367(a).

## PARTIES

9.      Plaintiff, CHASITY CONGIOUS, ("Plaintiff" or "Chasity") is a citizen of the United States of America, who, at all times relevant, resided in Tarrant County, Texas. Chasity is the mother of the decedent, Z.C.H. Chasity suffers from developmental disabilities and has been clinically diagnosed as schizophrenic; therefore, this action is being brought by and through her Guardian[1], Kimberly Hammond, on Chasity's behalf and as the mother and next friend of Z.C.H., the decedent.

10.     Defendant, DAVID NGUYEN, #4303 ("Defendant Officer") was, at the time of this occurrence, a duly licensed Fort Worth Police Officer. He engaged in the conduct complained of in the course and scope of his employment and under color of law. He is sued in his individual capacity.

11.     Defendants, L. MARTINEZ and N. CERVANTES ("Defendant Correctional Employees") were, at the time of this occurrence, Correctional Employees at Tarrant County Jail. They engaged in the conduct complained of in the course and scope of their employment and under color of law. They are sued in their individual capacities.

12.     Defendant, SHERIFF BILL WAYBORN ("Defendant Sheriff") was, at the time of this occurrence, the Sheriff of Tarrant County, Texas. He engaged in the conduct complained of in the course and scope of his employment and under color of law. He is sued in his official capacity.

---

[1] An uncontested petition for limited Guardianship has been filed concurrently.

13.     Defendant CITY OF FORT WORTH ("City") is a municipal corporation duly incorporated under the laws of the State of Texas, and is the employer and principal of Defendant Officer.

14.     Defendant TARRANT COUNTY ("County") is a municipal corporation duly incorporated under the laws of the State of Texas, and is the employer and principal of Defendant Sheriff.

## FACTS

15.     At all times relevant, Chasity Congious was a 21-year-old woman who was clinically diagnosed as schizophrenic and deemed moderately-mentally retarded.

16.     On or around May 19, 2019, Plaintiff Chasity was arrested and charged with a criminal offense.

17.     During the pendency of that case, her trial judge twice entered orders for her to be tested to determine whether she was competent to stand trial.

18.     However, she had been released prior to the delivery of the Judge's order and without receiving any assessment.

19.     Despite that, on or around 16 December 2019, she plead guilty to the offense was sentenced to four (4) years deferred prosecution and fine.

20.      At this time, she was approximately 4 months pregnant.

21.     On or around January 12, 2020, Chasity was undergoing a mental health crisis.

22.     As the family feared Chasity's episode might harm her child, they called the Fort Worth Police Department ("FWPD") for assistance in helping to calm her down.

23.     Chasity was adequately soothed and no further intervention was required.

24.     However, Chasity's condition continued to devolve.

**The Unlawful Arrest of Chasity Congious**

25.     On or around January 15, 2020, Chasity's mental health crisis worsened to the point that she began to engage in behaviors that were likely to lead to self-harm.

26.     Accordingly, the family once again called FWPD; this time to have Chasity, who was legally an adult, involuntarily committed at JPS Hospital.

27.     Upon information and belief, two police cruisers and an ambulance arrived.

28.     Despite the family's request for medical assistance, Defendant Nguyen arrested Chasity.

29.     Plaintiff's arrest was made without a warrant. Immediately before she was arrested by Defendant Nguyen, Plaintiff was not violating any laws, rules or ordinances. As the Plaintiff was being arrested, she was not violating any laws, rules, or ordinances. There was no probable cause or justification for the arrest of Chasity Congious on January 15, 2020.

30.     Chasity did not have the legal capacity to commit any crime on January 15, 2020, which was clear and apparent.

31.     Defendant Nguyen then filed false, incomplete, and misleading reports in order to sustain criminal charges against Chasity for the crime of causing injury to a minor. There was no probable cause or legal justification to commence criminal proceedings against her.

32.     As a result of these false charges, Chasity was held at Tarrant County Jail on a probation hold and was denied bond.

33.     From the date of her confinement until her eventual release five months later, Chasity never had a single court date.

34.     In violation of the Sandra Bland Act, the magistrate was never notified that Chasity suffered from a mental illness and an intellectual disability, no written assessment was provided about her condition, and/or no treatment plan was considered or initiated.

**Constitutional Violations at Tarrant County Jail**

35.     Upon her intake at Tarrant County Jail, it was reported that Chasity had a history of mental illness, required medication to treat that mental illness, and had a history of suicidal ideation.

36.     While detained at Tarrant County Jail, Chasity was not given adequate medication to treat her objectively serious medical conditions of schizophrenia, bipolar disorder, and pregnancy.

37.     Just four days after being admitted, Chasity was referred for observation due to reports of suicidal ideation as a result of being made fun of and abused by other inmates.

38.     The next day, Chasity once again met with mental health professionals who noted her demeanor was odd, and her mood and affect were incongruent.

39.     On 23 January, mental health treatment notes indicate that Chasity appeared child-like, shy, and had been diagnosed with an intellectual delay.

40.     By 24 January, Chasity had begun to refuse medication and food.

41.     By 28 January, Chasity's treatment notes indicated that she had become nonverbal and was not speaking.

42.     On 6 February, it was agreed that Chasity would stay in the infirmary (Unit 55) even after she was cleared from special status (i.e. suicide watch) due to her being picked on by the general population, not eating or caring for herself properly, and delusional thoughts.

43.     On 26 February, it was noted that Chasity often refused her meals.

44.     Chasity was not receiving proper medication to adequately regulate her objectively serious medical conditions of bipolar disorder and schizophrenia.

45.     Additionally, Chasity was not eating or gaining weight appropriately for a woman in such advanced stages of pregnancy.

46.     On 17 April, when staff attempted to check on Chasity's status, she just stood at her cell door staring at them and refused to speak.

47.     Over the next few weeks, Chasity began to talk to herself more vigorously and became aggressive.

48.     On May 1, the infirmary nurse reported that Chasity likely would not understand what a contraction was and became agitated when they attempted to explain it to her.

49.     Additionally, her last two OBGYN appointments had been cancelled.

50.     On May 13, Chasity finally had a visit with an OBGYN, who confirmed that Chasity was unable to express symptoms and would not recognize it if she were to go into labor.

51.     Nevertheless, she was returned to Tarrant County Jail.

**The Birth and Death of Z.C.H.**

52.     Chasity's required constant supervision due to her objectively serious medical conditions.

53.     On May 17, 2020, a short time after eating breakfast Chasity's stomach began to bother her and she thought she needed to use the bathroom; instead, she was going into labor.

54.     When Chasity was unable to use the bathroom and get rid of the pain, she banged on the window to get assistance but Defendant Correctional Employees were not there.

55.     At all times relevant, Defendant Correctional Employees were responsible for watching over and checking Chasity—who they knew to be nonverbal, suffering from objectively serious medical conditions, and unable to adequately understand or explain her condition.

8

56.     The toilet in Chasity's cell is next to a large window, and blood from Chasity's arduous labor was clearly evident on the toilet seat if anyone had checked.

57.     Instead, Chasity returned to bed unattended and struggled to deliver Z.C.H.

58.     At or around 9:07 am, Defendant Correctional Employees finally entered Chasity's cell and noticed blood on her bedding.

59.     Paramedics rushed to Chasity's cell to assist in attending to Z.C.H. and Chasity; upon information and belief, Z.C.H.'s umbilical cord was wrapped around her neck and Chasity had lost a large amount of blood.

60.     At or around 9:36 am, Z.C.H. was rushed to Cook Children's Hospital for care in an ambulance where doctors attempted to provide her with life-saving care.

61.     At or around 9:55am, Chasity was taken in a second ambulance to JPS to undergo surgery to repair her body after she suffered a grade 3 perineal tear.

62.     At the hospital, Chasity was not responsive to questioning.

63.     Chasity's family was informed that Z.C.H. suffered from severe hypoxic ischemic encephalopathy, which means her brain was severely damaged due to lack of oxygen.

64.     As a result, Z.C.H. was unable to breathe on her own, remained comatose, and had no brain activity.

65.     On May 21, 2020, Z.C.H. was baptized.

66.     However, ongoing tests confirmed that Z.C.H. was brain dead and her condition would not improve over time.

67.     On May 26, 2020, a doctor at Cook Children's Hospital wrote a note to the Tarrant County Jail, explaining Z.C.H.'s condition in a futile attempt that they might let Chasity see her daughter.

68.     The request was denied.

69.     Doctors ceased providing Z.C.H. with intensive support and on May 27, 2020, at 1:48 pm, she died.

70.     That same day, the jail put Chasity on suicide watch.

71.     Chasity's family requested that she be allowed compassionate release to attend the funeral of Z.C.H.

72.     The request was denied.

73.     On June 12, 2020, Z.C.H.'s funeral was held without her mother's presence.

74.     Chasity never got a chance to see her daughter, let alone hold her.

**Chasity's Release from Jail and Treatment**

75.     In addition to other conditions, Chasity developed postpartum depression following the birth of Z.C.H.

76.     Worse, Chasity stopped eating completely.

77.     On June 18, 2020, the state moved to voluntarily dismiss the false charges that had been levied against her by Defendant Nguyen.

78.     Chasity was then taken to JPS Hospital for inpatient, round-the-clock care and treatment—the same institution the family had tried to have Chasity committed to when they originally called for assistance on January 15, 2020.

79.     After months of intensive, inpatient treatment Chasity was released from JPS into the care of her mother.

80.     Chasity still asks about Z.C.H. and when she will come back.

**Tarrant County Jail's History of Misconduct**

81.     On May 21, 2020, the Texas Commission of Jail Standards issued a corrective action plan and notice of non-compliance to the Tarrant County Jail in relation to late observation checks.

82.     Texas jail standards require a face-to-face observation checks of inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior at least every 30 minutes.

83.     At all times relevant, Defendant Sheriff was aware that Defendant Correctional Employees (and others) did not adequately check on inmates under their watch by failing to, among other things, enter cells to check on detainees, make eye contact with detainees, and/or receive verbal confirmation of detainees' condition.

84.     Tarrant County Jail has a longstanding history of failing to adequately check on its detainees. From January 2019 to September 2020, there have been at least 30 known incidents wherein inmates were left unattended due to the Jail's failure to check on them, including:

    a.  On 22 March 2019, a CO failed to conduct observation checks within the timeframe allotted;

    b.  On 23 March 2019, a CO failed to conduct observation checks within the timeframe allotted;

c.  On 3 May 2019, failed to conduct face-to-face observations within the timeframe allotted;

d.  On 28 May 2019, a CO was 1 hour and 42 minutes late conduct observation checks;

e.  On 25 June 2019, a CO falsified observation checks and failed to complete them on suicide prevention custody inmates;

f.  On 25 June 2019, a second CO falsified observation checks and failed to complete them on suicide prevention custody inmates;

g.  On 26 June 2019, a CO failed to make observation checks on suicide prevention custody inmates;

h.  On 26 June 2019, a different CO falsified observation checks on suicide prevention custody inmates;

i.  On 26 April 2020, a CO failed to make observation checks that resulted in an inmate's suicide;

j.  On 22 May 2020, a CO failed to make observations within the timeframe allotted;

k.  On 30 May 2020, a CO failed to make observations within the timeframe allotted;

l.  On 22 May 2020, a second CO failed to make observations within the timeframe allotted;

m.  On 13 June 2020, a CO failed to make observations within the timeframe allotted;

n.  On 19 May 2020, in Unit 55, a CO was 5 hours and 10 minutes late to observation first observation checks, and 2 hours and 38 minutes late to second face-to-face observation checks;

o.  On 20 May 2020, on Unit 55, a CO was 6 hours and 10 minutes late to first observation checks, and 2 hours and 38 minutes late to second face-to-face observation checks;

p.  On 26 June 2020, a CO failed to make observations within the timeframe allotted;

q.  On 16 June 2020, a CO failed to make observations within the timeframe allotted;

r.  On 5 July 2020, a CO failed to make observations within the timeframe allotted twice;

s.  On 17 July 2020, a CO failed to make observations within the timeframe allotted twice;

t.  On 9 July 2020, a CO failed to make observations within the timeframe allotted twice;

u.  On 18 July 2020, a CO failed to make observations within the timeframe allotted twice;

v.  On 30 July 2020, a CO failed to make observations within the timeframe allotted;

w.  On 1 August 2020, a CO failed to make observations within the timeframe allotted;

x.  On 14 July 2020, a CO failed to make observations within the timeframe allotted;

y.  On 31 July 2020, a CO failed to make observations within the timeframe allotted;

z.  On 22 May 2020, a CO failed to make observations through the entire shift;

aa. On 14 August 2020, a CO failed to make observations within the timeframe allotted;

bb. On 23 May 2020, a CO failed to make observations within the timeframe allotted;

cc. On 27 July 2020, a CO failed to make observations within the timeframe allotted;

dd. On 16 August 2020, a CO failed to make observations within the timeframe allotted; and

ee. On 7 September 2020, a CO failed to make observations within the timeframe allotted.

85. Worse, Tarrant County Jail has a longstanding custom or practice of failing to protect its most vulnerable inmates (housed in Unit 55). In addition to the lack of face-to-face checks mentioned above,

a. On 27 July 2015, a CO on the suicide prevention failed to conduct inmate face-to-face observations and falsely documented she had; this CO also left her duty station without being properly relieved, thereby leaving suicide prevention custody inmates unattended;

b. On 23 November 2017, a CO failed to conduct face-to-face observation checks on prevention inmates within the timeframe allotted; and

c. On 19 July 2020, three COs assaulted an inmate in his cell, causing the inmate to suffer a collapsed lung, rib fractures; the COs, who were later criminally charged for the assault, then then failed to report anything regarding the incident.

86. In 2020 alone, 21 inmates died in the custody of Tarrant County Jail, more than any other jail in North Texas and at a rate that is more than 3.5 times the mortality rate at Dallas County Jail during the same time period.

87. Tarrant County Jail has a long history of suspicious deaths occurring in their custody while doing nothing to reform their practices or to prevent future harm to inmates, including:

a. On 16 January 2019, an inmate who was suspected of suffering from mental illness or mental retardation died less than a day after she was booked into Tarrant County Jail after she was found unresponsive in her cell;

b.  On 5 April 2019, an inmate went into cardiac arrest less than six hours after being assaulted by jail staff and died less than a day after he was booked into Tarrant County Jail (a subsequent autopsy revealed the inmate had contusions and abrasions on his lip, inside of his mouth, upper right arm, radial forearm, right wrist, left forearm, left wrist, left hand, right knee, left knee, mid back, and buttocks);

c.  On 26 July 2019, an inmate who was on suicide watch was declared dead after being assaulted by jail staff (including the use of a restraint chair) less than a month after he was booked into Tarrant County Jail;

d.  On 1 August 2019, an inmate who was suspected of suffering from mental illness or mental retardation died after being assaulted by jail staff less than day after he had been booked into the Tarrant County Jail;

e.  On 6 August 2019, an inmate was rushed to the hospital less than a month after being booked into Tarrant County Jail where he stayed until his death on 31 August 2019;

f.  On 26 February 2020, an inmate who was suspected of suffering from mental illness or mental retardation died after he was found unresponsive in his cell after being booked into Tarrant County Jail just days prior;

g.  On 4 March 2020, an inmate died of cryptococcal meningitis while in the custody of the Tarrant County Jail after being booked in less than a month earlier;

h.  On 26 April 2020, an inmate who had been in Tarrant County Jail's custody for less than a month was found hanging in his cell and it took over 20 minutes for EMS to arrive and provide medical assistance;

i.  On 23 May 2020, a Tarrant County Jail inmate, who was suspected of suffering from mental illness or mental retardation was hospitalized just two days after complaining that his untreated anxiety had caused him to remain awake for the last 48 hours straight, died;

j.  On 19 June 2020, an inmate was found dead in Tarrant Count Jail just two days after being booked;

k.  On 24 June 2020, an inmate was found dead in Tarrant County Jail after suffering an assault by jail staff;

l.  On 25 June 2020, an inmate who was suspected of suffering from mental illness died after he was found laying naked in his cell less than 10 days after being booked into Tarrant County Jail;

m.  On 9 September 2020, an inmate was found dead in her cell just four days after being booked into Tarrant County Jail;

n.  On 14 September 2020, an inmate died after being found unresponsive in his cell less than three months after being booked into Tarrant County Jail;

16

o.  On 10 November 2020, an inmate died after being found unresponsive in his cell after being booked into Tarrant County Jail about nine days prior;

p.  On 17 December 2020, an inmate who was suspected of suffering from mental illness was found hanging in his cell and later declared dead on 22 December 2020;

q.  On 2 January 2021, a Tarrant County Jail inmate who had been declared incompetent to stand trial died after contracting covid;

r.  On 22 February 2021, an inmate died from a brain bleed while in the custody of Tarrant County Jail;

s.  On 21 March 2021, an inmate was found dead in their cell less than two months after being booked into Tarrant County Jail;

t.  On 20 July 2021, a Tarrant County Jail inmate who was suspected of suffering from mental illness died;

u.  On 18 August 2021, an inmate died after he was found hanging in his cell just three days after being booked into Tarrant County Jail;

v.  On 10 September 2021, an inmate who was suspected of suffering from mental health issues and needing to detox was found dead in his cell just days after he was booked into Tarrant County Jail; and

w.  On 14 September 2021, a Tarrant County Jail inmate who was suspected of suffering from mental health issues died after being found unresponsive in his cell.

88.     In 2021, Texas Commission on Jail Standards found that on multiple occasions the magistrate was not notified within the timeframe required by the Sandra Bland Act of inmates with suspected mental illness or learning disabilities.

89.     Tarrant County Jail has filed its annual inspection in three of the last seven years.

90.     The widespread practices mentioned above were the moving force of the injuries suffered by Plaintiff.

91.     As a direct and proximate result of the unlawful actions of the Defendants, Chasity Congious was injured, including physical injuries, pain and suffering, humiliation, embarrassment, fear, emotional trauma, mental anguish, the deprivation of her constitutional rights and dignity, interference with a normal life, lost time, and attorneys' fees, and Z.C.H. died.

## COUNT I: Denial of Medical Care

92.     Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

93.     As described more fully above, Defendant Nguyen had notice of Plaintiff's objectively serious medical conditions.

94.     Despite Defendant's notice, he failed to provide Plaintiff with necessary medical attention, in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States.

95.     As a direct and proximate result of the Defendants' misconduct, Chasity was harmed.

**COUNT II: False Arrest**

96. Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

97. The actions of Defendant Nguyen, described above, knowingly caused Plaintiff to be arrested and imprisoned without probable cause or any other justification and constituted a deliberate indifference to Plaintiff's right under U.S. Constitution in violation of the Fourth and Fourteenth Amendment.

98. As a direct and proximate result of the Defendants' misconduct, Chasity was harmed.

**COUNT III: Unlawful Pretrial Detention**

99. Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

100. The actions of Defendant Nguyen, described above, knowingly caused Plaintiff to be unlawfully detained pretrial without genuine probable cause, constituted a deliberate indifference to Plaintiff's right under U.S. Constitution in violation of the Fourth and Fourteenth Amendment.

101. As a direct and proximate result of the Defendants' misconduct, Chasity was harmed and Z.C.H. died.

**COUNT IV: Failure to Train, Supervise, or Discipline**

102. Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

103.    The Fort Worth Police Department has a pattern, practice, policy, history, and custom of unlawfully targeting Black citizens for arrest and prosecution, even when no crime has been committed. This is especially true for persons who may be suffering from a mental health crisis or otherwise require non-criminal intervention.

104.    Pursuant thereto, FWPD did not provide adequate training to Defendant Nguyen as it relates to (a) racial profiling; (b) proper arrest and confrontation techniques; and (c) interactions with persons with mental illness or in a mental health crisis.

105.    Prior to January 15, 2020, and at all times relevant, Defendant City and the FWPD was responsible for training its law enforcement officers, including but not limited to Defendant Nguyen, with regard to how to conduct proper welfare checks, but failed to fully, adequately, and properly do so.

106.    FWPD did not provide adequate training to Defendant Nguyen on appropriate methods and techniques to control situations similar to the one encountered by him on January 15, 2020.

107.    Chief Noakes, the final policymaker at FWPD, the Fort Worth City Council, and the City knew or should have known that the training provided to Defendant Nguyen was inadequate or nonexistent.

108.    In December 2018, a task force was created by the City of Fort Worth to address issues in race and policing. The taskforce released its report concluding that the City failed to address perceptions amongst residents that there was systemic racism in the FWPD.

109.    In 2017, Black men and women accounted for 17% of the City's population but constituted 41% of the arrests made by FWPD.

110.    In 2019, Blacks made up less than 20% of the population but made up 27% of all vehicle stops. Already disproportionate, the number jumps significantly when taking into account that only 14% of Black households in Fort Worth have access to a vehicle.

111.    Once stopped, Blacks were more likely to be searched than any other racial demographic even though they were less likely to be found with contraband than any other racial demographic.

112.    FWPD's racially discriminatory practices have manifested themselves within the internal operations of the department.

113.    In January 2015, then-Chief Halstead resigned after both the Black and Latino officers' associations called for his removal after an investigation documented his failure to address racially-hostile behavior within the department.

114.    This racially-discriminatory atmosphere is reflected in the employment and promotion practices of FWPD.

115.    In 2017, FWPD sworn personnel were 65% white while Fort Worth population was only 38% white; meanwhile, Black FWPD officer constituted just 7% of detectives and were excluded entirely from specialty units such as SWAT, K-9, Criminal Intelligence, Homicide, Major Cases, and Robbery.

116.     FWPD fails to train its officers on the Sandra Bland Act, which requires diversion of persons suffering a mental health crisis to a treatment center in the agency's jurisdiction.

117.     Likewise, FWPD fails to enforce its own policy, which requires an individual to be immediately transported to JPS Psychiatric Emergency Center whenever a subject poses a substantial risk of serious harm to themselves or others.

118.     The City's refusal to address these longstanding issues regarding race and the targeting of Black citizens caused the false arrest and unlawful detention of Chasity, and the death of Z.C.H.

119.     As a direct and proximate result of the Defendant City's misconduct, Chasity was harmed and Z.C.H. died.

## COUNT V: Unconstitutional Conditions of Confinement

120.     Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

121.     Under the Fourteenth Amendment, corrections employees are required to provide for the reasonable health and safety of persons in pretrial custody.

122.     As part of this right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail to at least the same degree of persons in custody subsequent to a conviction. Deliberate indifference to Plaintiff's objectively serious medical conditions violated this right.

123.     There was no legitimate basis to confine Plaintiff in such a manner, thus it amounted to punishment.

124.     Defendants' actions and inactions caused the condition of Plaintiff's confinement, which violated her right to treatment and adequate medical care.

125.     As a direct and proximate result of the Defendants' misconduct, Chasity was harmed and Z.C.H. died.

<p align="center"><u>**COUNT VI: Denial of Reasonable Medical Care**</u></p>

126.     Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

127.     Under the Fourteenth Amendment, pretrial detainees have a right to receive adequate medical care. As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail.

128.     At all relevant times, Chasity had a serious medical condition that was known to Defendants.

129.     At all relevant times, Defendants were aware of and disregarded the serious and excessive risk of harm presented by refusing to provide Chasity with adequate medical care and were deliberately indifferent to that risk.

130.     Defendants knew that there was a foreseeable risk that Chasity and her child would be harmed if not provided with adequate medical care.

131.     Defendants demonstrated deliberate indifference to Chasity's serious medical needs by refusing or delaying requests to move Chasity to a hospital, refusing or delaying her access to needed medication, and failing to supervise her.

132.    Defendants' actions and inactions resulted in the confinement of Plaintiff in a jail where they did not have the capacity to adequately to treat her or provide her with medical care.

133.    Defendants' actions and inactions caused the condition of Plaintiff's confinement, which violated her right to treatment and adequate medical care.

134.    As a direct and proximate result of the Defendants' misconduct, Chasity was harmed and Z.C.H. died.

<u>**CLAIM VII: Violation of the Rehabilitation Act**</u>

135.    Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

136.    Section 504 of the Rehabilitation Act provides that "[]no otherwise qualified individual with a disability in the United States... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. §794.

137.    Section 504n requires covered entities to provide reasonable accommodations to enable qualified individuals with disabilities to participate in the program or activity.

138.    Defendants are subject to the Rehabilitation Act as employees of entities of local government that receive federal financial assistance. 29 U.S.C. § 794(b); C.F.R. §27.1.

139.    Chasity is a qualified individual with a disability pursuant to Section 504 because she has schizophrenia which substantially limits her neurological function and other major life activities.

140.    By failing to provide Chasity with a reasonable accommodation, the need for which was evident from the time of her detention until her release, Defendants discriminated against Chasity in violation of Section 504.

141.    Defendants' conduct was intentional and deliberately indifferent to Chasity's federally protected rights.

142.    As a result of the Defendants' misconduct, Chasity was harmed and Z.C.H. died.

### CLAIM VIII: Violation of the Americans with Disabilities Act

143.    Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

144.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

145.    The ADA requires public entities to provide reasonable accommodations to qualified individuals with disabilities to enable them to benefit from the service and participate in the program or activity.

146.    Chasity is a qualified person with a disability pursuant to the ADA because she is substantially limited in neurological function and other major life activities due to her schizophrenia.

147.    By failing to provide Chasity with a reasonable accommodation, the need for which was evident from the time of her detention until her release, Defendants discriminated against Chasity in violation of the Americans with Disabilities Act.

148.    Defendants' conduct was intentional and deliberately indifferent to Chasity's federally protected rights.

149.    As a direct and proximate result of the Defendants' misconduct, Chasity was harmed and Z.C.H. died.

## COUNT IX: Malicious Prosecution

150.    Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

151.    The actions of Defendant Nguyen, described above, knowingly caused Plaintiff to be charged with an offense that he knew she did not commit and for which he knew there was no probable cause.

152.    Defendant City is sued in this Count pursuant to the doctrine of *respondeat superior* in that Defendant Nguyen performed the action complained of while on duty and/or in the employ of the City of Fort Worth, and while acting within the scope of his employment.

153.    As a direct and proximate result of the Defendants' misconduct, Chasity was harmed and Z.C.H. died.

## COUNT X: Intentional Infliction of Emotional Distress

154.    Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

155.    The actions of the Defendants, described above, knowingly caused Plaintiff—a mentally handicapped woman suffering from severe mental illness-to be arrested, charged, and detained in unconstitutional conditions during a pandemic while she was pregnant with her first and (likely) only child for a crime that she did not commit.

156.    Defendants' actions were extreme and outrageous, exceeding all bounds of human decency.

157.    Defendants performed the acts detailed above with the intent of inflicting severe emotional distress or with knowledge of the high probability that the conduct would cause such distress.

158.    The municipal defendants are sued in this count under the doctrine of *respondeat superior* in that the individually-named defendants engaged in the actions complained of while on duty, in the employ of the municipality, and while acting within the course and scope of their respective employment.

159.    As a direct and proximate result of the Defendants' misconduct, Chasity was harmed and Z.C.H. died.

## COUNT XI: Survival Action

160.    Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

161.    Plaintiff is the mother and next friend of Z.C.H., deceased.

162.    Z.C.H. dies as a result of the Defendants' wrongful conduct.

163.    Z.C.H. would have been entitled to bring this action against Defendants had she lived.

164.    The decedent's right of action for wrongful and negligent conduct against the Defendants survives in favor of her legal representatives.

## COUNT XII: Wrongful Death

165.    Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

166.    By reason of Defendants' wrongful conduct, Z.C.H. died and Defendants are liable for damages.

167.    Defendants conduct that caused Z.C.H.'s death was a proximate cause of the injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and for their acts and infliction of emotional distress caused by the wrongful killing of Z.C.H.

## CONDITIONS PRECEDENT

168.    Plaintiff reserves her right to plead and prove damages to which she is entitled to at the time of trial. All conditions to Plaintiff's recovery have been performed or have occurred.

## REQUEST FOR RELIEF

WHEREFORE the Plaintiff, CHASITY CONGIOUS, by and through her Guardian, Kimberly Hammond, on behalf of herself and as Mother and Next Friend of

Z.C.H., deceased, respectfully requests that this Honorable Court enter judgment in her

favor and against the Defendants, CITY OF FORT WORTH, OFFICER NGUYEN, L.

MARTINEZ, N. CERVANTES, SHERRIFF WAYBOURN, and TARRANT COUNTY, for

actual, compensatory, exemplary, and punitive damages; pre-judgment interest at the

maximum rate allowed by law and post-judgment interest pursuant to 28 U.S.C. § 1961,

continuing until such judgment is paid, at the maximum rate allowed by law;

reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and other applicable

law; unliquidated damages in an amount that is within the jurisdictional limits of the

Court; and any such other and further relief that the Court deems equitable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully Submitted,

**CHASITY CONGIOUS, by and through her
Guardian, Kimberly Hammond, on behalf of
herself and as Mother and Next Friend of
Z.C.H.,**

By:      /s/ Marwa Elbially

*One of Plaintiff's Attorneys*

Marwa Elbially, Esq.
ELBIALLY LAW OFFICE, PLLC
704 East 15th Street, Suite 204
Plano, TX 75074
T: 972.423.7330
E: info@ElBiallylaw.com

Jeanette Samuels
SAMUELS & ASSOCIATES, LTD.
53 West Jackson Blvd., Suite 831
Chicago, Illinois 60604
T: 872.588.8726
F: 872.813.5256

29

E: Sam@ChiCivilRights.com
(*Pro Hac Vice Pending*)


Jarrett Adams
LAW OFFICES OF JARRETT ADAMS, PLLC
40 Fulton St., Floor 23
New York, New York 10038
T: 646.880.9707
F: 646.880.9707
E: JAdams@JarrettAdamsLaw.com
(*Pro Hac Vice Pending*)